**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-21011-CIV-ALTONAGA/Goodman**

IN THE MATTER OF:

**THE COMPLAINT OF BLUE CREST HOLDING**
**ASSET, INC.**, as Owner and Operator of the M/Y MIMI,
for Exoneration from and/or Limitation of Liability,

        Petitioner.

_____/

## ORDER SETTING FORTH FINDINGS OF FACT AND CONCLUSIONS OF LAW

Third-Party Plaintiff, Miami Beach Marina Associates, Ltd. ("MBM") filed a Motion to
Enforce the Settlement Agreement with Blue Crest Holding Asset, Inc. and Maximilian Camino
[ECF No. 197] on January 5, 2018. By Order [ECF No. 210] dated January 29, 2018, the Court
denied the Motion to Enforce and directed the parties to schedule the matter for an evidentiary
hearing. That hearing took place on March 14 and 15, 2018. (*See* [ECF Nos. 250 & 252]). At
the evidentiary hearing, MBM called six witnesses to testify: John Alder, John Hopwood, John
Keller, Maximilian Camino, Marlin Kareem Green, and Janice McIntyre. Neither BCH nor Mr.
Camino called any witnesses.

The Court has carefully considered the testimony of the witnesses, the exhibits admitted,
the parties' written submissions, and applicable law. Based on its review of the record and
pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following findings of
fact and conclusions of law.

## I.  FACTUAL FINDINGS

1.      On March 17, 2017, Petitioner, Blue Crest Holding Asset, Inc. ("BCH"), filed a
Verified Complaint for Exoneration from or Limitation of Liability [ECF No. 1].

2.      BCH was an owner of the M/Y MIMI, an 80-foot Hatteras Motor Yacht.  The Vessel is the subject of this Limitation of Liability Proceeding due to an incident that occurred on October 2, 2016.  Underwriters at Lloyd's ("Blue Crest Lloyd's") appointed Mr. Green to bring the Limitation Action.

3.      The only claims asserted directly against BCH are those of MBM; James Terry; and Certain Underwriters at Lloyd's of London Under Binding Authority: B0901LC1616622000 subscribing to Policy Number: 500061-ACH as the subrogee of FCM (BVI) Trading as Sunsail and The Moorings Limited, the owner, charterer and/or operator of the M/Y LAZY SUSAN and M/Y ANDIAMO (collectively "Claimant Lloyd's").

4.      Mr. Green, attorney-in-fact for BCH, verified the Complaint.  (*See* Compl. 8). Mr. Green brought the Limitation Action on behalf of Blue Crest Lloyd's, insurers for the MIMI. Mr. Green reports to both the primary and excess leads for Blue Crest Lloyd's.

5.      Mr. Green received instructions from both the primary and excess insurers[1] with regard to defending the case.  At some point there was a shift as to which insurer, the primary or excess, would give Mr. Green instructions to file the Limitation Action.  Mr. Green never informed anyone there was a switch from primary to excess underwriters; he never indicated to MBM's counsel that control of the case was being handed to someone else.

6.      With its Complaint, BCH issued the following *Ad Interim* Stipulation of Value:

. . . Petitioner, as principal, and Certain Underwriters at Lloyd's, London, as sureties, hereby undertake the sum of ONE HUNDRED THIRTY SEVEN THOUSAND AND NO/100 DOLLARS ($137,000.00) and such increases or decreases in such amount as this Court may time to time order and that they agree that they will file in this proceeding a Stipulation to Abide Decree or Stipulation

---

[1]Primary coverage exists where, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability.  Excess insurance attaches only after a predetermined amount of primary coverage has been exhausted.  *See Privilege Underwriters Reciprocal Exch. v. Hanover Ins. Grp.*, No. 16-cv-61742, 2018 WL 477277, at *5 (S.D. Fla. Jan. 19, 2018).

For Value in such amount as this Court may from time to time order and that they agree that they will file in this proceeding a Stipulation to Abide Decree or Stipulation For Value in such amount as the Court may direct, with interest at the rate of 6% per annum from the date hereof, and that pending the filing of a Stipulation to Abide Decree or the giving of a Stipulation for Value therefor, this Stipulation shall stand as security for all claims in the limitation proceeding.

*          *          *

Petitioner and said surety hereby commit themselves to the jurisdiction of the Court and agree to abide by all orders of the Court, interlocutory and final, and to pay the amount awarded, if any, by the Final Judgment rendered by this Court, or an appellate court if an appeal intervenes, not to exceed the amount of ONE HUNDRED THIRTY SEVEN THOUSAND AND NO/100 DOLLARS ($137,000.00) with interest at the rate of 6% per annum, unless a Stipulation to Abide Decree or Stipulation for Value therefor shall be given as aforesaid in the meantime, in which event this *Ad Interim* Stipulation shall be void.

(Compl. Ex. B, 14–15[2] (alteration added)).

7.      The *Ad Interim* Stipulation was signed on March 17, 2017 by BCH, and Certain Underwriters at Lloyd's, London. By the terms of the *Ad Interim* Stipulation, Blue Crest Lloyd's is a surety to BCH.

8.      In the *Ad Interim* Stipulation, Mr. Green did not identify which Certain Underwriters at Lloyd's were being bound as sureties. He also did not have the sureties countersign the *Ad Interim* Stipulation. There was an acknowledgment in the *Ad Interim* Stipulation that Mr. Green had authority to bind Blue Crest Lloyd's.

9.      BCH never separately filed a claim for damages to the MIMI against MBM. BCH filed a counterclaim against MBM but did not assert any damages to the MIMI. Instead, BCH asserted indemnity and contribution for any claims BCH might be required to pay as a result of other lawsuits filed against it in the Limitation Action.

---

[2] The Court uses the pagination generated by the electronic CM/ECF database, which appears in the headers of all court filings.

10.     On October 2, 2016, Blue Crest Lloyd's provided Hull Machinery and Equipment, Protection and Indemnity ("P&I") coverage and other insurance coverage for BCH and the MIMI.

11.     BCH had both a primary insurance policy and an excess insurance policy for the MIMI.   The primary policy, B0621MMILYBY15096, attaching to delegated underwriting contract number B0621MMILYBY15CVA, effective February 16, 2016, had P&I coverage for the MIMI valued at $1,000,000.  The primary policy is subject to the American Yacht Form R12.

12.     The American Yacht Form R12 states insurers will not only pay the cost and expenses of the defense, but if they name the lawyers, the insurers have discretion and control. As such, the insurers have a duty to pay for the defense and defend the insured.  Primary insurers have the duty to pay for the defense, separate and apart from the policy limits.

13.     The excess policy, attaching to the unique market reference of B0621MMILXPI16025, effective February 16, 2016, had excess insurance coverage for the MIMI valued at $3,000,000.  Prior to this litigation, neither BCH nor Third-Party Defendant, Maximilian Camino, informed MBM there was an excess policy for the MIMI.

14.     The excess and primary policies for the MIMI list the Lloyd's syndicates and managing agents (collectively "syndicates") for each policy.  There are common syndicates for both policies.   For example, Munich Re Syndicate, Limited ("Munich Re") and Ace Underwriting Agencies Limited are listed on the primary and excess policies.

15.     According to Mr. Green, his client for purposes of the excess policy was the lead of that policy, Munich Re.  Mr. Green stated his client for purposes of the primary policy was the lead of that policy "Chubb," now known as Ace Underwriting Agencies Limited.

16.     Mr. Green undertook BCH's defense at the expense of Blue Crest Lloyd's, in addition to being the attorney for marine surveyor John Alder, who signed the Affidavit of Value accompanying the Complaint.  (*See* Compl. Ex. A 10–11).  Mr. Green was hired to undertake the defense of Blue Crest Lloyd's' insureds.

17.     MBM operates the Miami Beach Marina, a public marina located in Miami Beach.  RCI Marine Inc. is an affiliated company to MBM and operates select aspects of the marina.  The property on which the marina is situated is owned by the City of Miami Beach.

18.     MBM is insured by Travelers Property Casualty Company of America, which issued a policy that was in effect on October 2, 2016.

19.     Mr. Camino was an owner of the MIMI.   He is a corporate lawyer and businessman, has incorporated over ten companies, and sits on several corporate boards.  Mr. Camino has held positions with several corporations as corporate secretary, director, managing member, and president.

20.     Throughout this litigation, Mr. Camino has taken the position he is the authorized representative for BCH.  He was not aware BCH filed this Limitation Action on March 17, 2017, nor was he consulted on the filing of the lawsuit.

21.     When Mr. Camino was served with MBM's Third-Party Complaint, he contacted his personal attorney, Stephen Gillman of Shutts & Bowen.  Nevertheless, the MIMI's insurers are paying Mr. Green to defend Mr. Camino in the suit.

22.     Mr. Camino signed four contracts with MBM for dockage of the MIMI, each listing him as owner.  All contracts include the same material language.

23.     Dock Space Lease and License Agreements signed by Mr. Camino for dockage of the MIMI were entered on May 1, 2014, October 1, 2014, and October 1, 2015.  Mr. Camino did

not qualify his signature on the documents  by stating he was signing as a representative for someone, including BCH.

24.     On October 1, 2016, Mr. Camino entered a fourth Dock Space Lease and License Agreement with MBM ("MIMI Marina Agreement") for dockage of the MIMI commencing October 1, 2016.  Again, he did not qualify his signature in the MIMI Marina Agreement by writing that he was signing on behalf of BCH.  The MIMI Marina Agreement was in effect at the time of the incident that occurred on October 2, 2016.

25.     Under the MIMI Marina Agreement, Mr. Camino agreed:

> At all times, OWNER retains exclusive care, custody and control of, and is solely responsible for, VESSEL, its engines, appurtenances and contents. MARINA is not a bailee of VESSEL, its engines, appurtenances or contents and assumes no responsibility for safe operating condition, tie up, dockage or maintenance of VESSEL. OWNER is solely responsible for security of VESSEL and for preventing entry by unauthorized persons on VESSEL.

(MBM Hr'g Ex. 16, 2).

26.     The MIMI Marina Agreement also states:

> If the person signing this APPLICATION is not the OWNER, such person: (a) must fully name and identify OWNER in this APPLICATION, (b) warrants and represents his/her authority to obligate OWNER and VESSEL to this AGREEMENT, (c) agrees to be bound personally, jointly and severally, with OWNER and VESSEL pursuant to this AGREEMENT, and (d) certifies that he/she has lawful custody and control of VESSEL as Captain/Agent of OWNER.

(*Id.* 1).  Mr. Camino did not name and identify BCH as "owner" in the MIMI Marina Agreement. He represented his authority to bind BCH to the MIMI Marina Agreement and agreed to be personally, jointly and severally bound.

27.     Blue Crest Lloyd's, both primary and excess underwriters, appointed marine surveyor John Alder.  Throughout the litigation, Mr. Alder represented himself as Blue Crest Lloyd's' inspector, surveyor and "authorized representative."  In email correspondence with

MBM, Mr. Alder stated he was representing Lloyd's of London. Mr. Green never had any concern about Mr. Alder signing his emails as the representative of Lloyd's of London, nor did Mr. Green ever correct Mr. Alder.

28.     MIMI's hull and liability underwriters appointed Mr. Alder, and since October 3, 2016, he has been working on behalf of the Lloyd's syndicates for the MIMI. He never specified to MBM which Lloyd's insurers he was appointed by.

29.     Mr. Alder was paid by Blue Crest Lloyd's through JLT Insurance, a London broker that placed the insurance risk for the MIMI. JLT's Robert Williams would refer Mr. Alder's reporting to Blue Crest Lloyd's.

30.     On October 2, 2016, the MIMI was docked at the marina when in the late-night hours, an unidentified individual attempted to operate the MIMI out of her slip. The individual caused extensive damage to MBM and other vessels at the marina. MBM sustained damages when the MIMI collided with pilings and other structures of the marina.

31.     Captain Brenda Bedell was the captain of the MIMI on October 2, 2016, responsible for the safety and security of the MIMI. While onboard the MIMI, Mr. Camino would instruct Captain Bedell on where he wanted the MIMI to go.

32.     On October 3, 2016, Mr. Alder went to the marina instructed by Blue Crest Lloyd's to assess the damage to the MIMI, to other vessels, and to the marina itself.

33.     Mr. Alder was directly involved in arranging for the MIMI's salvage. Resolve Salvage and Fire Americas Inc. ("Resolve Salvage") was contracted to undertake removal of the MIMI. Mr. Alder was issued a salvage plan on behalf of the MIMI's owners and insurers. Mr. Alder never distinguished between MIMI's primary and excess underwriters in his dealings with Resolve Salvage.

34.     Part of the salvage plan for the MIMI involved bringing in a barge.  On behalf of Blue Crest Lloyd's, Mr. Alder contracted with salvors and salvor sub-contractors, including Kearns Construction Company (the company that provided the barge for removal of the MIMI), in an effort to remove the wreckage of the MIMI from the marina.

35.     Mr. Alder asked Kearns Construction to send its invoices to him so he could remit payment directly.  Kearns Construction sent an invoice dated December 23, 2016 for payment to "John Alder/Lloyd's."  (MBM Hr'g Ex. 7).  In issuing payment, Mr. Alder issued a check to Kearns Construction in the amount of $2,000.00 for the MIMI salvage operation.

36.     Mr. Alder made several payments to Kearns Construction for the MIMI's removal.  He received the money to pay Kearns Construction from the Lloyd's syndicates who underwrote the risks for the MIMI.

37.     Mr. Alder evaluated the amount claimed by Resolve Salvage for the removal of the MIMI.  Mr. Green was involved in this process, communicating with Mr. Alder regarding the amounts claimed by Resolve Salvage.  On January 10, 2017, Mr. Alder wrote Resolve Salvage advising he had audited the billing and found it excessive.  As a result, Resolve Salvage filed an arbitration proceeding against BCH.  Mr. Green defended BCH in the arbitration, resulting in an award against BCH.

38.     Blue Crest Lloyd's paid Mr. Green for the defense of BCH in the salvage or removal of the MIMI, although he does not know which insurer made the payments.

39.     Mr. Alder was asked by Mr. Green's firm to pay Resolve Salvage with funds from his trust bank account, a sum of approximately half a million dollars.  The MIMI's insurers paid the arbitration award that issued on July 10, 2017, after this Limitation Action was filed.

40.     At a joint marina inspection on October 16, 2017, Mr. Alder signed the "Participant Sign in Sheet" as the representative of Blue Crest Lloyd's.

41.     On November 30, 2017, representatives for MBM; MBM's insurer; Blue Crest; Mr. Camino; Blue Crest Lloyd's; Denver Yacht Club, LLC ("DYC"); Marksman Security Corporation ("Marksman"); Marksman's insurer; James Terry; Claimant Lloyd's; and the parties' respective attorneys attended mediation before Manuel R. Morales. Notice of the mediation was served on the parties' insurers.

42.     Mr. Alder, who was also in attendance, stated he was there representing Blue Crest Lloyd's. Mr. Green, appointed by Blue Crest Lloyd's, and Mr. Gillman, represented Mr. Camino at the mediation.

43.     At the mediation, Mr. Terry's claim for damage to SEAMAN'S HARVEST was resolved. Mr. Green was given authority to settle this claim by MIMI's excess insurer, which paid the claim.

44.     Prior to the start of mediation, Mr. Green and MBM's counsel stepped outside the room to confirm Mr. Alder's role at the mediation. Mr. Green assured MBM's counsel Mr. Alder was attending on behalf of Blue Crest Lloyd's. Mr. Green never told MBM's counsel Mr. Alder was in attendance for only one of MIMI's insurers. Mr. Alder never specified which Lloyd's syndicate he was representing at the mediation.

45.     Mr. Green never sought any authority from the primary insurer with respect to the mediation, not considering it necessary.

46.     Before the mediation commenced, the mediator asked the parties to introduce themselves, identify who they represented, and summarize their respective positions. Mr. Green made an opening statement regarding BCH and Mr. Camino's positions.

47.     Mr. Green never stated Lloyd's had a separate subrogation[3] claim that needed to be resolved.  At no time did Blue Crest Lloyd's bring a subrogation claim against MBM for damage to the MIMI.  And at no time prior to or during the mediation did Mr. Alder or Mr. Green state Blue Crest Lloyd's would be bringing a subrogation claim against MBM or any other entity.

48.     The only subrogation claim brought by Blue Crest Lloyd's was against the City of Miami Beach, as memorialized in a July 3, 2017 letter signed by Mr. Green.  Mr. Green's claim on behalf of Blue Crest Lloyd's fails to clarify which underwriters/syndicates are involved in that subrogation claim.  The letter to the City of Miami Beach did not include a valid release or other documents showing the MIMI's insurers had a valid subrogation claim against the City.

49.     Mr. Green was at the mediation representing both Mr. Camino and BCH, and introduced himself as their attorney.  Every party at the mediation had counsel and an insurance representative present.

50.     At no time prior to or during the mediation did Mr. Alder distinguish himself as being there on behalf of the primary insurer versus the excess insurer.  Mr. Alder heard Mr. Green set out to the other parties BCH and Mr. Camino's positions in the lawsuit.

---

[3] Subrogation is the substitution of one person in the place of another with reference to a lawful claim, demand or right; he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies, or securities.  *See Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1287 (11th Cir. 2007) (internal quotation marks and citations omitted).  "[W]hen an insurer asserts a subrogation claim against a third-party tortfeasor, the insurer's rights are limited to the rights of recovery possessed by the insured. . . .  Thus, an insurer is barred from bringing a subrogation action if the insured . . . releases the tortfeasor from liability."  *S. Ins. Co. v. CJG Enters., Inc.*, No. 3:15-cv-00131-RGE-SBJ, 2017 WL 3449609, at *3 (S.D. Iowa May 11, 2017) (alterations added; internal quotation marks and citations omitted).  "An insurer waives its right to subrogation when it neither obtains an agreement preserving its right . . . , *nor in any way disclaims its liability*."  *Liberty Mut. Fire Ins. Co. v. Wal-Mart Stores E., LP*, 269 F. Supp. 3d 1254, 1263 (M.D. Fla. 2017) (internal quotation marks and citation omitted; alterations and emphasis in original); *see also Privilege Underwriters Reciprocal Exch.*, 2018 WL 477277, at *7 (holding where a settlement agreement was reached in the underlying lawsuit, an email from an insurance broker to the underwriter did not preserve a right to subrogation).

51.     Blue Crest Lloyd's did not institute a subrogation action against MBM prior to the parties entering into the settlement agreement at issue, titled, "Acknowledgement of Settlement." (*See* Acknowledgement of Settlement [ECF No. 197-1]).

52.     At no time prior to or during the mediation did Mr. Green or Mr. Alder say Blue Crest Lloyd's was not completely resolving all claims against MBM.

53.     At all times throughout the mediation, Messrs. Alder and Camino were aware Mr. Green was conducting settlement negotiations in an effort to resolve the claims.  Mr. Green had authority to enter into a settlement agreement if the parties resolved their respective claims.

54.     Mr. Camino came to the mediation expecting the lawsuit would be dropped against him and that he would not have to pay anything in settlement.  Mr. Green understood that Mr. Camino did not intend to pay for MBM's losses.  Mr. Camino expected Blue Crest Lloyd's to pay for those losses.

55.     Throughout the eight to eleven hours of mediation, Messrs. Green and Alder were seated next to each other.   Both made telephone calls to London to obtain authority or confirmation with respect to the terms of any settlement.  No one ever stated there were different Lloyd's underwriters at the mediation.

56.     After mediation, it was learned that Blue Crest Lloyd's' excess insurer was to fund the settlement, not Mr. Camino or anyone else.

57.     If it had been disclosed at mediation that no one was present representing Blue Crest Lloyd's: (1) MBM would have objected to Mr. Alder's participation insofar as he was a witness in the case and hired by Blue Crest Lloyd's, with no authority to settle; and (2) MBM would have insisted the mediation be adjourned until an authorized representative with

settlement authority granted by Blue Crest Lloyd's (or whatever insurance entity provided the applicable insurance) participated in the mediation.

58.     Any claims Blue Crest Lloyd's alleges it may have against MBM for damages to the MIMI, thereby suggesting a subrogation action may be pursued on behalf of insureds Mr. Camino and BCH against MBM, have not been raised by counterclaim.

59.     The mediation resulted in all claims in this action settling except for subrogated claims of Claimant Lloyd's.  MBM settled its claims with BCH and Mr. Camino for $300,000.

60.     Mr. Camino, on behalf of himself and BCH, MBM, and the attorneys for each executed the Acknowledgement of Settlement at mediation.

61.     The purpose of the Acknowledgment of Settlement was to put in writing the negotiated settlement reached by the parties.  The Acknowledgment of Settlement was drafted in the presence of Messrs. Camino, Gillman and Alder.  Mr. Gillman added some specific terms.

62.     The mediation was an evolutionary process.  Mr. Morales would go back and forth between the parties to add language into the document the parties wanted included.  At no time did Messrs. Alder and Camino object to the terms of the Acknowledgment of Settlement.

63.     BCH and Mr. Camino expressly agreed Blue Crest Lloyd's was bound by the settlement.

64.     The Acknowledgment of Settlement states:

1.  BCH agrees to pay MBM the sum of $300,000 in full, final and complete settlement of all claims between these parties.

2.  These parties agree to execute a Full Mutual Release with confidentiality clause of all claims between them and their employees, representatives, agents and insurers and to dismiss their case against each other with prejudice.

*          *          *

> 3. . . . The releases will include a release of any and all claims against Max[imilian] Camino, City of Miami Beach and Marksman. All claims and counterclaims that BCH and MBM have against each other will all be dismissed with prejudice.

(Acknowledgement of Settlement (alterations added)).

65. Mr. Green testified he interpreted "insurers" to mean an insurer that had an active claim in the lawsuit. Yet, Mr. Green agrees there are no active insurance claims in the litigation. At no point prior to signing the Acknowledgement of Settlement, did Mr. Green seek any clarification of what was meant by the term "insurers."

66. Notably, Mr. Green never communicated to MBM or its representatives, either orally or in writing, his intention to limit "insurers." According to his testimony at the evidentiary hearing, Mr. Green communicated this intention only to the mediator. It is notable the mediator did not testify at the hearing and advised the parties he has no recollection of such a conversation with Mr. Green. There is no evidence to corroborate Mr. Green's assertion that he communicated to the mediator his intention to limit the meaning of the word "insurers."

67. Although Mr. Green states he advised the mediator of his intention to limit the meaning of the word "insurers," he could not explain why he did not communicate this understanding to the other parties.

68. It was understood by MBM's insurer that paragraph 2 of the Acknowledgement of Settlement meant all claims between MBM, Mr. Camino, BCH, and their insurers were resolved without any party having the right to pursue additional claims.

69. As noted, the Acknowledgement of Settlement stipulates that all claims and counterclaims BCH and MBM have against each other will be dismissed with prejudice. Mr. Alder understood the term "with prejudice" to mean the case between the parties is done. Mr.

Alder never objected to Mr. Green signing the Acknowledgment of Settlement, nor did he ever tell Mr. Green he could not sign a document that released all claims of insurers.

70.     No one present at the mediation asked Mr. Green to add language to the Acknowledgment of Settlement stating Blue Crest Lloyd's does not resolve its subrogation claims against any party. Indeed, the plain language of the Acknowledgment of Settlement does not carve out any subrogation right against MBM.

71.     Mr. Camino never objected to Mr. Green signing the Acknowledgment of Settlement, nor did he tell Mr. Green he could not sign a document that released all claims of insurers. Mr. Camino signed the Acknowledgment of Settlement on behalf of BCH and himself.

72.     No one at the mediation stated to anyone representing the interests of MBM that any subrogation claims were left open. Had this been the case, MBM would not have settled the claims against BCH and Mr. Camino. Mr. Keller and MBM's insurance representative would not have signed the Acknowledgment of Settlement had there been any indication any insurers disagreed with any of the terms.

73.     Mr. Alder was not aware of any potential subrogation claims being brought by the primary layer carrier. Mr. Alder's understanding was the only three matters pending in the Limitation Action to be mediated were: MBM's claim against BCH and the MIMI, the claim by ANDIAMO and the LAZY SUSAN, and the claim by SEAMAN'S HARVEST.

74.     BCH and Mr. Camino agreed the settlement funds would be remitted to MBM within 30 days from the date of settlement, or by December 30, 2017.

75.     When seeking confirmation regarding when the settlement funds would be remitted, Mr. Green advised that "London" would wire transfer the settlement funds to his trust

account for final remittance to MBM. The $300,000 in settlement has been deposited in Mr. Green's trust account.

76. As quoted, the Acknowledgement of Settlement requires the parties to execute a full mutual release of all claims between them and their employees, representatives, agents and insurers; and to dismiss their case against each other with prejudice. The effect of this language is to obligate all sides involved in the mediation to have their insurers sign the release.

77. Post-mediation, the attorneys for MBM, BCH, Blue Crest Lloyd's and Mr. Camino began circulating standard release language to memorialize the agreement set out in the Acknowledgement of Settlement.

78. In a December 4, 2017 email to Mr. Green, counsel for MBM listed a series of entities that needed to be included in the release. (*See* MBM Hr'g Ex. 25). RCI Marine appears as the second entity to be included. (*See id.*). Highly relevant to Mr. Green's understanding of the terms of the Acknowledgement of Settlement, Mr. Green responded to the email by stating, without limitation, "Thanks for your follow-up email and the information contained therein. *We will put the entities noted in the proposed release*." (*Id.* 1 (emphasis added)).

79. Mr. Green's written response, composed but a few days after the Acknowledgement of Settlement was executed, is consistent with MBM's understanding of the parties' obligations under their agreement. The written response is also directly contrary to Mr. Green's later position, expressed in BCH's January 19, 2018 Response in Opposition to MBM's Motion to Enforce the Settlement Agreement [ECF No. 205], stating it was not agreed RCI Marine would be added to the release. Mr. Green's email response acceding to MBM's identification of RCI Marine as an entity to be included in the release is also contrary to his testimony at the evidentiary hearing.

80.     On December 8, 2017, the parties filed a Joint Notice of Settlement of Claims [ECF No. 186].

81.     On December 19, 2017, Mr. Green emailed counsel for MBM with a draft of the proposed release, containing the following language: "[T]he Releasing Parties hereby agree to indemnify, to save, defend, and hold harmless the Released Parties from any and all claims arising from the alleged incident at issue in . . . CASE NO. 17-21011-CIV-ALTONAGA/GOODMAN, including any subrogated interests, or liens of any third parties including, but not limited to, subrogation rights . . . regardless of their source."  (Proposed Release of All Claims [ECF No. 264-1] 2 (alterations added)).  Consistent with this provision, Mr. Green's Proposed Release included MBM and The Travelers Property Casualty Company of America as releasing parties, and, designated BCH and Mr. Camino, and "their insurers and/or reinsurers" as released parties.  (*Id.*).

82.     Mr. Green's Proposed Release included the release of RCI Marine.  (*See id.* 1).

83.     MBM's attorney responded to Mr. Green's Proposed Release, advising the release had to be mutual as called for in the Acknowledgement of Settlement, agreeing to sign a "mirror" agreement from BCH and Mr. Camino with the same language as proposed, but removing any carve out for BCH and Mr. Camino's insurers.

84.     On December 28, 2017, Mr. Green emailed MBM's counsel stating for the first time the "releases need to indicate that the claims resolved are only between the parties" to the Limitation Action and advising that BCH and Mr. Camino "cannot waive any rights the Insurers may have."  (Mot. to Enforce Ex. B [ECF No. 197-2] 1).

85.     Mr. Green then proposed the following language be added to the release: "'By executing this release, the parties acknowledge that Blue Crest and Camino have no right or

ability to impair its [sic] insurer's and/or reinsurer's rights, including rights to subrogation against any entity.'" (*Id.*). This later release language proposed by Mr. Green, and its import, are not contained in the Acknowledgment of Settlement.

86.     MBM's attorneys objected to Mr. Green removing references to "insurers" and "reinsurers" in the release from Blue Crest and Mr. Camino as "unacceptable," given "insurers" and "reinsurers" are clearly set out as terms in the Acknowledgment of Settlement.  (Proposed Post-Hearing Findings of Fact, Ex. 2 [ECF No. 264-2]).

87.     Removing any reference to "insurers" from the release is contrary to the plain language of the Acknowledgment of Settlement.  It is also inconsistent with the standard release language contained in Mr. Green's first Proposed Release, whereby the releasing party agrees to indemnify, defend and hold harmless the released party from, among other things, "subrogated rights, . . . any and all other subrogated interest or liens, regardless of their source."  (Proposed Release 2 (alteration added)).

88.     To date, MBM has not received payment as agreed in the Acknowledgment of Settlement, nor has it received a document releasing all claims between the parties and their insurers.

89.     As a result of BCH, Blue Crest Lloyd's and Mr. Camino's failures to abide by the terms of the Acknowledgement of Settlement and remit the $300,000 to MBM without delay, MBM has incurred additional attorney's fees and pre-judgment interest.

## CONCLUSIONS OF LAW

90.     BCH commenced this action under Rule 9(h) of the Federal Rules of Civil Procedure and the Supplemental Rules governing Admiralty and Maritime Claims. (*See* Compl. ¶ 1).  MBM filed a claim against BCH as well as third-party claims against Mr.

Camino and others. (*See* Answer, Affirmative Defenses and . . . Third Party Complaint [ECF No. 17]).

91.     "[A] district court has inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case. . . .  To that end, it is clear that the district court may hold an evidentiary hearing and make factual determinations." *Ford v. Citizens & S. Nat'l Bank, Cartersville*, 928 F.2d 1118, 1121 (11th Cir. 1991) (alterations added; internal quotation marks and citation omitted).

92.     "The settlement agreement in this matter is a contract to abandon claims that are cognizable only in admiralty.  Accordingly, general federal maritime law governs the validity and enforceability of the settlement agreement." *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1354 (S.D. Fla. 2007) (citations omitted).  In any event, "the rules of contract interpretation under federal maritime and Florida law are identical." *F.W.F., Inc. v. Detroit Diesel Corp.*, 308 F. App'x 389, 392 (11th Cir. 2009) (citing *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 n.2 (11th Cir. 1990) ("choice of law questions can be avoided if the laws of the different jurisdictions lead to identical results")).

93.     For an enforceable contract to exist there must be an offer, an acceptance, consideration, and sufficient specification of the terms so the obligations can be ascertained. *See W. Constr., Inc. v. Fla. Blacktop, Inc.*, 88 So. 3d 301, 304 (Fla. 4th DCA 2012) (citation omitted).  The burden of showing that an opposing party assented to the terms of an agreement rests with the party seeking its enforcement.  *See BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1133 (M.D. Fla. 2007) (citation omitted).

94.     Settlements remain highly favored and will be enforced whenever possible given they represent a means of amicably resolving doubts and terminating lawsuits. *See Robbie v.*

*City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985) (citing *Pearson v. Ecological Science Corp.*, 522 F.2d 171, 176 (5th Cir. 1975), *cert. denied*, 425 U.S. 912 (1976)); *see also Murchison v. Grand Cypress Hotel Corp.*, 13 F.3d 1483, 1487 (11th Cir. 1994) ("We favor and encourage settlements in order to conserve judicial resources. We cannot allow a litigant to attack the integrity of the settlement process by attempting to recharacterize the focus of his litigation after he decides he is unhappy with the settlement.").

95.     "A settlement is, after all, intended to resolve litigation, not proliferate or protract it." *Naumann v. Cambridge Tankers, Inc*., 1988 AMC 1996, 1998 (E.D. Pa. 1988). "To foster settlements, the settling parties must have legal assurance that the other party will not pursue any further litigation." *Sea-Land Serv. v. Sellan*, 64 F. Supp. 2d 1255, 1260 (S.D. Fla. 1999).

96.     "Any consideration of [a] settlement agreement must commence with the recitation of two basic rules of analysis." *Reed v. United States*, 717 F. Supp. 1511, 1515 (S.D. Fla. 1988) (alteration added). First, "compromises of disputed claims are favored by the courts." *Id.* (citations omitted). Second, if "the parties acting in good faith, settle a controversy, the courts will enforce the compromise without regard to what result might, or would have been, had the parties chosen to litigate rather than settle." *Id.* (citation omitted). *See also Connecting Waves Water Taxi Servs., N.A. v. Jedison Power Catamarans, Inc.,* No. 14-62067-CIV, 2015 WL 1843031, at *4 (S.D. Fla. April 22, 2015).

97.     The primary task in the interpretation of a settlement agreement is to ascertain the intention of the parties. The parties' intent must be gathered from the instrument itself without reference to extrinsic evidence unless the settlement agreement is ambiguous. *See United States ex rel. E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 782 (11th Cir. 1990) (citation omitted). "If a party claims that a contract or term thereof is ambiguous, the burden is upon that

party to show the necessary indefiniteness of meaning." *F.W.F.*, 494 F. Supp. 2d at 1360 (citation omitted).

98. "The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs — not on the parties having meant the same thing but on their having said the same thing." *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974) (internal quotation marks and citation omitted).

99. The standard for determining whether a matter has been settled in Florida has been aptly summarized as follows: "[u]nder Florida law, [MBM], as the party seeking to compel enforcement of a settlement agreement, must demonstrate that [Mr. Green] had clear and unequivocal authority to enter into the settlement agreement." *Murchison*, 13 F.3d at 1485 (citations omitted; alterations added).

100. The following factors may be considered in deciding whether a client has given his attorney clear authority to settle a case: 1) whether the client knew his lawyer was in the process of negotiating a settlement; 2) whether and how many times the client met or spoke with his attorney while settlement negotiations were ongoing; 3) whether the client was present when the settlement was reached; 4) whether the client immediately objected to the settlement; and 5) whether the client was an educated man capable of understanding the terms of the settlement agreement. *See id.* at 1485–86.

101. The parties engaged in settlement negotiations on November 30, 2017, resulting in the Acknowledgement of Settlement. The Acknowledgement of Settlement was signed by Mr. Green as "counsel for Blue Crest & Max[imilian] Camino" and Mr. Camino as "party." (Acknowledgement of Settlement 2 (alteration added)). Mr. Camino was at the mediation on

behalf of himself and BCH. Mr. Camino knew his lawyers were in the process of negotiating a settlement of the case with MBM. He was at the mediation for approximately 11 hours, and in the mediation room with Messrs. Green, Alder and Gillman, all for the express purpose of resolving the case against Mr. Camino and BCH. Mr. Camino was present when the Acknowledgement of Settlement was being negotiated and signed the document.

102. Applying the factors in *Murchison*, 13 F.3d at 1486, the Court finds Mr. Green had authority to settle the case on behalf of Mr. Camino and BCH. Mr. Camino participated in the ongoing settlement negotiations, and by his own admission wanted to have his insurers fund the settlement so he would not have to pay. This is precisely why in the Acknowledgement of Settlement BCH was listed as the party to pay the settlement amount.

103. Mr. Green further had the clear and unequivocal authority to include RCI Marine in the release, as after the mediation, he communicated, without reservation, "We will put the entities noted in the proposed release."

104. Mr. Green was given clear and unequivocal authority to settle the case; and Mr. Camino, on behalf of himself and BCH, approved the settlement of all claims between the parties.

105. A motion to enforce a settlement agreement is similar to a breach of contract action. *F.W.F., Inc.*, 494 F. Supp. 2d at 1360. To recover damages for breach of a maritime contract, "a plaintiff must prove (1) the terms of a maritime contract; (2) that the contact was breached; and (3) the reasonable value of the purported damages." *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005) (citations omitted).

106. BCH and Mr. Camino breached an agreement related to the settlement of MBM's claims against BCH and Mr. Camino. MBM has shown by a preponderance of the evidence:

    a. it had a contractual agreement with BCH and Mr. Camino whereby within 30 days from the date of the settlement, or December 30, 2017, BCH/Blue Crest Lloyd's would remit to MBM settlement funds in the amount of $300,000 to settle all claims between the parties, and "all claims between them and their employees, representatives, agents and insurers [would be] dismiss[ed] . . . with prejudice" (Acknowledgement of Settlement ¶ 2);

    b. the parties knowingly and voluntarily agreed to the terms of the Acknowledgement of Settlement;

    c. the terms of the Acknowledgment of Settlement are clear and unambiguous; and

    d. the settlement is binding on BCH, Mr. Camino and Blue Crest Lloyd's.

107. As settlement agreements are contracts, the prerequisite that the parties must have a meeting of the minds is equally applicable. *See Ford*, 928 F.2d at 1121. In other words, if there is no meeting of the minds, it cannot be said there was mutual assent to form a valid contract. *See Larsen v. Citibank FSB*, 871 F.3d 1295, 1304 (11th Cir. 2017). ("The element of mutual assent requires a meeting of the minds as to the essential terms of the contract, the absence of which renders a contract unenforceable." (internal quotation marks and citation omitted)).

108. The testimony and evidence presented shows a meeting of the minds was reached at the mediated settlement. That meeting of the minds was reduced to writing in the Acknowledgment of Settlement. Mr. Green's later and inconsistent retraction and effort to limit the language of the required release are not indicative of a lack of mutual assent. They are, rather, an effort by BCH and Mr. Camino to breach the settlement agreement for an unknown

reason.  If BCH and Mr. Camino are presently not able to produce what they agreed to deliver in paragraph 2 of the Acknowledgement of Settlement, then there is a breach.

109.    The parties reached an agreement where the terms are "crystal clear" and unambiguous: "BCH agrees to pay to MBM the sum of $300,000 in full, final and complete settlement of all claims between the parties."  (Acknowledgement of Settlement ¶ 1).  If Mr. Green was unclear on any of the terms, he had ample opportunity to seek clarification.  There is no language leaving any potential subrogation claim open, exposing MBM to future liability. Certainly the onus is on the party wishing to carve out a subrogation claim to do so in order to preserve any subrogation right.  *See St. Paul Guardian Ins. Co. v. United States*, 117 F. Supp. 2d 1349, 1356 (S.D. Fla. 2000).

110.    "[O]ne who binds himself to a contract which cannot be performed without the consent or co-operation of a third person is not relieved of liability because of his inability to secure the required consent or co-operation[.]"  C.T. Foster, Annotation, *Modern Status of the Rules Regarding Impossibility of Performance as a Defense*, 84 A.L.R.2d 12, at § 22 (1962) (alterations added; citation omitted).

111.    MBM has proven by a preponderance of the evidence that BCH and Mr. Camino entered into a valid and enforceable settlement with MBM.  By the terms of the Acknowledgement of Settlement, BCH, and by virtue of insuring BCH, Blue Crest Lloyd's, agreed to pay $300,000 within 30 days from the date of settlement, or December 30, 2017.  BCH and Mr. Camino also agreed payment of this sum to MBM would be "in full, final and complete settlement of all claims between these parties."  (Acknowledgement of Settlement ¶ 1).

112.    BCH and Blue Crest Lloyd's failed, neglected, or otherwise refused to remit payment in the amount of $300,000 to MBM.  As per the terms of the Acknowledgement of

Settlement, BCH and Mr. Camino owe MBM $300,000, exclusive of interest incurred for the time frame the settlement funds have been withheld.

113.     Last, and most importantly, BCH and Mr. Camino agreed to execute a full mutual release with a confidentiality clause of all claims between them and their employees, representatives, agents and insurers, and to dismiss their case against each other with prejudice.

114.     MBM has proven a breach of the Acknowledgement of Settlement by BCH and Mr. Camino by their failure and refusal to execute a full, mutual release.

115.     BCH's position subrogation was never discussed or negotiated at mediation is of no avail.   All parties understood and agreed that (1) all insurers would be bound by the settlement agreement; and (2) subrogation interests and subrogation rights were not only to be released, but each releasing party was to indemnify, defend and hold harmless each released party from all subrogation interests and subrogation rights.

116.     No notice was given to any of the parties, at any stage in this litigation, that Blue Crest Lloyd's had a separate subrogation claim needing resolution.  Blue Crest Lloyd's not only failed to provide notice, its attorney and agent, Mr. Green, manifested clear written intent that full mutual releases would be exchanged by the parties and their insurers, and the mutual releases contemplated resolution of all subrogated interests and subrogation rights.

117.     "[I]f the insurer is on notice of a potential settlement and does nothing to prevent it, it risks losing its subrogation rights through its lack of diligence."  *Gov't Emps. Ins. Co. v. Dizol*, 176 F. Supp. 2d 1005, 1036 (D. Haw. 2001) (alteration added).

118.     In its pre-hearing Proposed Findings of Fact and Conclusions of Law [ECF No. 239], BCH stated notice was not served upon any of the parties' insurers and as such, a right to subrogation remains open.  Yet, Blue Crest Lloyd's was on notice as of June 6, 2017,

when it would have received the first Notice of Mediation, that the parties would be attending mediation in the near future with the purpose of resolving all claims. Mr. Green, as the attorney appointed by Blue Crest Lloyd's, was responsible to make sure Lloyd's's primary insurer received notice of the mediation. *See* S.D. Fla. Local Rule 16.2(e).

119. Furthermore, a "'release executed by an insured in favor of a wrongdoer generally extinguishe[s] the insurer's subrogation rights against that wrongdoer.'" *QBE Ins. Corp. v. Jorda Enters., Inc.*, No. 10-21107-CIV, 2012 WL 12844302, at *9 (S.D. Fla. Aug. 6, 2012) (alteration added) (quoting *Lincoln Nat. Health and Cas. Ins. Co. v. Mitsubishi Motor Sales of Am., Inc.*, 666 So.2d 159, 163 (Fla. 5th DCA 1995)).

120. Where an insurer is aggrieved in its subrogation rights by the insured's settlement with a third party, the insurer's remedy is against the insured, not the third-party tortfeasor. *See State Nat'l. Ins. Co. v. Cummins Mid-South, L.L.C.*, No. 11-2207, 2013 WL 796031, at *3 (E.D. La. Mar. 1, 2013) (citation omitted).

121. To allow Blue Crest Lloyd's to pursue a subrogation claim against MBM after a settlement has been reached requiring that "all claims between them and their employees, representatives, agents and insurers" be dismissed, "would countenance an insurance company's unilateral action prolonging litigation and would discourage settlements." *Liberty Mut. Fire Ins. Co.*, 2017 WL 3682369, at *6 (internal quotation marks and citation omitted).

122. More importantly, MBM would be greatly prejudiced if Blue Crest Lloyd's were allowed to pursue a subrogation action after a settlement were reached which included Blue Crest Lloyd's and brought finality to this litigation. Blue Crest Lloyd's had ample time from when it may have paid BCH and Mr. Camino under the policy at issue to file suit. MBM was never put on notice of Blue Crest Lloyd's's intention to pursue a subrogation claim against it. As

such, the parties always understood any attempt to settle the matter would include Blue Crest Lloyd's.

123.   Even at the mediation, Mr. Alder, as representative of Blue Crest Lloyd's, and Mr. Green, as attorney for Blue Crest Lloyd's, made no direct mention to MBM of any intention of pursuing a subrogation claim against MBM.   Indeed, Mr. Green's actions reasonably led MBM to believe all insurers' subrogated interests and subrogation rights were resolved by the settlement.   There is no evidence to support the assertion that MBM had knowledge of Blue Crest Lloyd's' subrogation rights prior to the November 30, 2017 — the date the Acknowledgment of Settlement was signed.

124.   It was clearly the intention of the parties to account for the potential of future subrogation actions by insurers in the Acknowledgment of Settlement by providing there be full mutual releases of all claims between them and their insurers, and requiring dismissal with prejudice.

125.   Furthermore, BCH and Mr. Camino have failed to show that when they executed the Acknowledgement of Settlement, they carved out a right for Blue Crest Lloyd's to pursue a subrogation claim.   The duty to ensure that a release carves out a right to pursue a subrogation claim belongs to the attorney wishing to preserve this right.   *See St. Paul Guardian Ins. Co.*, 117 F. Supp. 2d at 1356.

126.   BCH filed its Answer and Affirmative Defenses to MBM's Counterclaim on July 12, 2017 (*see* [ECF No. 112]), and Mr. Camino filed his Answer and Affirmative Defenses on June 9, 2017 (*see* [ECF No. 69]).

127.   BCH pleaded two counts in its Counterclaim [ECF No. 112] against MBM for relief: Count 1, Common Law Indemnity; and Count 2, Contribution.   (*See generally id.*).   In its

Counterclaim, BCH failed to state a claim against MBM for any damages it may have suffered to the MIMI or any damages sustained by reason of removing the wrecked MIMI from the Marina. (*See generally id.*).

128.   BCH had the opportunity to file a counterclaim against MBM to assert damages to the MIMI at the time it filed its Counterclaim for indemnity and contribution.  BCH chose not to serve a claim on MBM for the damages it sustained.  Instead, as part of its response to MBM's claim in the Limitation Action, BCH filed a Counterclaim only alleging indemnity and contribution from MBM if BCH was found liable for other damages or third-party damages.

129.   In addition to the damages for breach of the Acknowledgement of Settlement in the amount of $300,000, MBM also seeks pre-judgment interest.

130.   "In admiralty, prejudgment interest must be granted unless peculiar circumstances justify its denial; whether the circumstances are sufficient to justify the denial is left to the discretion of the district court."  *Dillingham Shipyard v. Associated Insulation Co.*, 649 F.2d 1322, 1328 (9th Cir. 1981) (citation omitted); *see also Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980) (finding that prejudgment interest should be awarded in admiralty cases as "compensation for the use of funds to which the claimant was rightfully entitled"); *Matter of Rio Grande Transp., Inc.*, 770 F.2d 262, 264–65 (2d Cir. 1985) (finding prejudgment interest may be awarded on the amount of settlement where payment was unreasonably delayed).

131.   The rate of pre-judgment interest agreed to by BCH and Blue Crest Lloyd's in the *Ad Interim* Stipulation is 6%.  (*See* Compl. Ex. B, 13-15).

## CONCLUSION

Consistent with the foregoing, the Court finds:

1. The parties knowingly and voluntarily signed the Acknowledgement of Settlement, which states, "BCH agrees to pay to MBM the sum of $300,000 — in full, final and complete settlement of all claims between these parties."

2. The Acknowledgement of Settlement stipulates, "[t]hese parties agree to execute a Full Mutual Release with confidentiality clause of all claims between them and their employees, representatives, agents and insurers and to dismiss their case against each other with prejudice." The "with prejudice" dismissal of all claims between the parties and their employees, representatives, agents and insurers has one meaning — the parties stipulate to the dismissal of all claims between them, including their respective employees, representatives, agents and insurers. Applying the aforementioned contractual principles, the Acknowledgement of Settlement is clear and unambiguous.

3. The essential terms of the settlement are evidenced by the Acknowledgement of Settlement, the draft releases submitted by the attorneys to each other immediately following its execution, and the testimony of the witnesses. If BCH disputed that its insurers were separate entities, not parties to the suit, and that therefore, it and Mr. Camino could not waive any rights of the insurers, then BCH and Mr. Camino should have included that language in the Acknowledgement of Settlement or otherwise removed the word "insurers" from the Acknowledgement of Settlement." Petitioner did not do so.

4. Petitioner, Blue Crest Holding Asset, Inc., and Third-Party Defendant, Maximilian Camino, authorized their respective attorneys to enter into a binding settlement agreement with the essential terms laid out in the Acknowledgement of Settlement and further delineated in draft releases. For reasons that are still unclear, BCH and Mr.

Camino subsequently changed their minds and refused to execute the written release and abide by their obligations under that agreement. BCH and Mr. Camino are therefore in breach of the settlement contract and are required to execute the settlement release and comply with their obligations under that agreement.

5. Claimant/Third Party Plaintiff, Miami Beach Marina Associates, Ltd.'s Motion to Enforce Settlement Agreement **[ECF No. 197]** is **GRANTED** as follows:

   a. Within ten (10) calendar days of this Order, BCH and Mr. Camino shall execute a Mutual Release of All Claims presented by MBM, that includes the language originally proposed by BCH regarding the indemnification and release of subrogated interests as set out in page 2 of that document; and

   b. Remove the later suggested language, "By executing this release, the parties acknowledge that Blue Crest and Camino have no right or ability to impair their insurer's and/or reinsurer's rights, including rights to subrogation against any entity. This agreement is not a waiver of Blue Crest's nor Camino's insurer's or reinsurer's rights to subrogation and expressly reserves those rights of subrogation," consistent with this Order.

6. Within ten (10) calendar days of this Order, BCH is ordered to pay MBM the amount of Three Hundred Thousand Dollars ($300,000.00), plus pre-judgment interest in the amount of 6% per annum, as agreed by BCH in the *Ad Interim* Stipulation, with interest accruing at the daily rate of $ 49.31 until paid in full.

7. The Court retains jurisdiction to enforce the terms of this Order and to determine any entitlement to attorney's fees and costs. No motions for fees and costs will be entertained

until after the time for filing an appeal has passed or any appeal is concluded, whichever occurs later.

8. An order of final judgment shall be entered separately. MBM shall file a proposed final judgment order by **May 22, 2018**, including calculation of pre-judgment interest. Pursuant to the procedures outlined in the CM/ECF Administrative Procedures, the proposed order must also be emailed to altonaga@flsd.uscourts.gov in Word format.

9. The Clerk of Court is instructed to **CLOSE** the case, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Miami, Florida, this 16th day of May, 2018.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record